WILTON WOOLEN COMPANY and GEORGE G. FERNALD, In Equity,

*vs.*

G. H. BASS & COMPANY.

G. H. BASS & COMPANY, In Equity,

*vs.*

WILTON WOOLEN COMPANY.

Franklin.    Opinion December 17, 1914.

*Deeds.    Privilege.    Reservations.    Rights.    Vent.    Water Power.    Water Rights.*

In bills in equity brought to determine the respective rights of the three owners of the water power developed by a dam at the outlet of Wilson Lake in the town of Wilton, it is,

*Held:*

1. That all these rights became united in one F. J. Goodspeed, and he is the admitted source of title under whom the three present owners claim.
2. That under the deed from Goodspeed to G. R. and Gardner G. Fernald dated November 12, 1898, the grantees were given a sufficient quantity of water from the canal through a penstock to supply a water wheel not venting over one hundred square inches of water.

3. That this grant to Fernald was unlimited and unrestricted, and has the priority over the power remaining at that time in Goodspeed, the grantor, or in his successors in title.

4. That under the same deed a restriction was imposed upon Goodspeed, his heirs and assigns, whereby, when the water in the pond should fall below four and one-half feet from the top of the dam, Goodspeed could not use more than one hundred square inches. This is subject to the Fernald priority of one hundred square inches. So that, at that head, both could not use jointly more than two hundred square inches; and if the quantity is less than that, Fernald is entitled to one hundred square inches and Goodspeed (now Bass & Co.) to the balance, up to one hundred square inches.

5. That Goodspeed conveyed the balance of the real estate and water rights to the Wilton Woolen Company on January 15, 1903, the Woolen Company thereby succeeding to his rights and being bound by his limitations.

6. That under the deed from the Woolen Company to Bass & Company, dated September 18, 1903, the Woolen Company conveyed not their entire water rights except what were reserved in the deed itself, but carved out a second and limited portion from the original Goodspeed ownership, leaving the residue in itself unconveyed.

7. That Bass & Company took under this deed the right "to draw from Wilson Lake sufficient to furnish 40 horse power, with latest improved wheels" etc., and no more. That its grant is limited, under conditions existing at the time of the conveyance, to forty horse power, and this continues until the water has reached a point four and a half feet below the top of the dam, subject at all times to the Fernald grant of one hundred square inches.

8. That the Wilton Woolen Company during that same period is entitled to all the water in excess of the Fernald grant and of the Bass & Company grant.

9. That when the water reaches the four and a half foot mark, Bass & Company are entitled to, and limited to, one hundred square inches, subject to the Fernald grant of the same amount; and if at any time Bass & Company are not using that full quantity the Wilton Woolen Company is entitled to the difference between what Bass & Company are using and the full one hundred square inches, so that the joint use of Bass & Company and the Woolen Company shall not exceed one hundred square inches.

10. That, no limitation as to time being stated in the deed, Bass & Company have the right to use the water, to which they are entitled, as many hours a day as they deem proper.

11. That the one hundred square inches of water to be used by Bass & Company when the four and a half foot point is reached, is to be measured at the water wheel, the same place where the forty horse power is to be measured.

12. That the matter of regulating the use of the water to comply with the rights of the respective owners is one of hydraulic engineering rather than of law, and can doubtless be arranged by agreement.

On report.   Bill of *Wilton Woolen Company* and *Fernald* v. *Bass & Company* sustained with costs.   Bill of *Bass & Company* v. *Wilton Woolen Company* dismissed.   Case remanded for further proceedings in accordance with this opinion.

Bills in equity to determine the respective rights of the three owners of the water power developed by a dam at the outlet of Wilson Lake in the town of Wilton.   Answers were filed to both bills and replications to the answers were filed.   The Justice hearing the above cause, being of the opinion that questions of law were involved of sufficient importance to justify the same, and the parties agreeing thereto, this cause was reported to the Law Court upon so much of the foregoing evidence as is legally admissible, the Law Court to render such final judgment as the equitable rights of the parties may require.

The cases are stated in the opinion.

*C. N. Blanchard, and E. E. Richards,* for Wilton Woolen Co. and G. G. Fernald.

*Frank W. Butler, and Wm. M. Bradley,* for G. H. Bass & Company.

SITTING:  SAVAGE, C. J., CORNISH, BIRD, HALEY, HANSON, PHILBROOK, JJ.

CORNISH, J.   The problem before the Court in these cases is the determination of the respective rights of the owners of the water power developed by a dam at the outlet of Wilson Lake in the town of Wilton.   Prior to November 12, 1898, there existed various water rights owned by several different persons, the old saw mill property being situated nearest the dam and the old grist mill property farther down the stream.   What these rights were and how they were distributed among the owners becomes immaterial here, because it is admitted that they were all united in one F. J. Goodspeed, under deed from G. R. Fernald dated November 9, 1898, and from Franklin J. Clark dated July 11, 1899.   Goodspeed is the agreed fountain of title to the rights now under consideration, and these rights are now owned by the three parties to these bills in equity, Gardner G. Fernald, G. H. Bass & Company, and the Wilton Woolen Company.

1.   *Fernald Privilege.*   The first parcel carved out was the Fernald property which was by deed dated November 12, 1898.   This con-

veyance covered a part of the old grist mill lot with buildings thereon, subject to certain reservations immaterial here. The water rights conveyed and now in controversy were as follows:

"I also grant and convey to the said G. R. Fernald and Gardner G. Fernald their heirs and assigns, the right to construct and maintain a penstock over my land, under the surface, of sufficient capacity to supply a water wheel not venting over one hundred square inches of water. By the term "vent" meaning the area of the opening that will discharge the same amount of water the wheel uses under the same head as the wheel is placed.

The head of said penstock to start from any place in the wall of the canal, back of the present mill shed not nearer than twenty feet from the present flume to the present grist mill, and run to the land now deeded; granting the said G. R. Fernald and Gardner G. Fernald, their heirs and assigns the right to enter on or over my premises at any and all times for the purpose of making repairs on said penstock or to look after the rock at the head of said penstock. The head of said penstock not to be below the level of the flume of the grist mill. The rock for said penstock to be allowed to project into the canal a sufficient distance to allow the water to pass freely to the mouth of said penstock.

Also hereby conveying to said G. R. Fernald and Gardner G. Fernald their heirs and assigns, the right and privilege of having and using, on these premises herein described at all times a sufficient quantity of water from the above mentioned canal, through the penstock aforesaid to supply a water wheel not venting over one hundred square inches of water.

When the water in the pond is lower than within four and a half feet of the top of the present dam across the outlet of Wilson Pond, I restrict myself, my heirs and assigns from using from the power now owned by me an amount of water greater than that herein deeded to G. R. Fernald and Gardner G. Fernald, their heirs and assigns, viz: one hundred square inches."

The controversy on this conveyance arises over the restriction in the last paragraph. Mr. Fernald claims that he is entitled to one hundred square inches of water, whatever the head may be, while Bass & Company, as a subsequent grantee from Goodspeed, contend that when the water in the pond is lower than within four and a half feet from the top of the dam, then Fernald is not entitled to a priority

of one hundred square inches, but the then available water must be divided equally between Fernald and the Bass Company. That is, if under that condition there are only one hundred and fifty square inches available, Fernald is not entitled to one hundred and Bass & Company to fifty, but each is entitled to seventy-five.

In our opinion the Fernald contention must be sustained. When Goodspeed carved out the one hundred square inches and retained all the balance, then Fernald had a priority in the quantity granted. The right of the grantee to the extent of the grant is superior to that of the grantor, and neither the grantor nor those holding under him have the right to interfere with the grant nor diminish the quantity of water granted. *Oakland Woolen Co.* v. *Gas Co.*, 101 Maine, 198. The grant to Fernald was unlimited and unrestricted. Its terms are: "the right and privilege of having and using on these premises herein described, *at all times* a sufficient quantity of water from the above mentioned canal through the penstock aforesaid to supply a water wheel not venting over one hundred square inches of water." The only restriction is that self imposed upon the grantor, Goodspeed, as to the rest of the power. When the water reaches that low level, then "I restrict myself, my heirs and assigns from using from the power now owned by me an amount of water greater than that herein deeded to G. R. Fernald and Gardner G. Fernald, their heirs and assigns, viz: one hundred square inches." This imposes no restriction upon the grantee for the benefit of the grantor, but upon the grantor for the benefit of the grantee. The grantor at that low head cannot use more than one hundred square inches. Fernald has a priority for his grant of one hundred, and the grantor or his successor can use all in excess of one hundred up to two hundred but no more. The object of the restriction was to prevent the head from being drawn down by the grantor to too low a level and thereby unduly diminish or destroy the power already granted to Fernald. We need say no more concerning the extent of the Fernald grant and the quantity of water to which he is entitled.

2. *G. H. Bass & Co. and the Wilton Woolen Co.*

After the conveyance to Fernald, already considered, Goodspeed conveyed to the Wilton Woolen Company, on January 15, 1903, the balance of the real estate and water rights owned by him, and the Woolen Company therefore stood in his place, succeeding to his rights and being bound by his limitations.

On September 18, 1903, the Woolen Company conveyed to G. H. Bass (the predecessor in title of G. H. Bass & Co.) "Certain real estate and water power . . . . described as follows:

"The saw mill at outlet of Wilson Lake and yard subject to any rights of way hitherto reserved, or other reservations or restrictions of use of land heretofore made, and being the same mill described in deed by R. C. Fuller and George R. Fernald to Hiram Holt by deed of Sept. 13, 1883, and of record book 98, page 352, in Franklin Registry with the following water power and privilege *and none other* to wit: the right to draw from Wilson Lake water sufficient to furnish forty (40) horse power with latest improved water wheels, after a reasonable development of the privilege, until the water reaches a point four and one-half ($4\frac{1}{2}$) feet below the top of the dam as now used, but when the water has reached said point his right to use water is limited to one hundred square inches and he is to have that right, and in case the dam furnishing said power is raised or the power from said lake is in any way increased the said Bass shall be entitled to his full proportionate benefit. In case at any time when the water is below the four foot and one-half mark, and the grantee is not using the full one hundred square inches of water thereof, the grantor reserves the right to draw sufficient water through its own private waste gate to make up the full one hundred inches including that used by the grantee. Said grantee is to bear one-half of the expense of keeping in repair and maintaining canal on land herein conveyed, head gates and dam.

Also herein conveying all the machinery, tools and fixtures belonging to the grantor in said saw mill or used with and belonging to it."

What water rights do Bass & Company have under this deed and what, if any, still remained in the Woolen Company. The Woolen Company claims that this conveyance carved out a second portion from the original ownership and granted to Bass & Company certain real estate and a portion of the water rights, leaving in itself the residue unconveyed; while Bass & Company urge that the conveyance of the land at the outlet of the lake, the only point where the water could be used, conveyed ex necessitate rei their entire water rights also, except what were expressly reserved in the deed, and that such reservation marks the limit of the power remaining in the Woolen Company.

On this we must sustain the Woolen Company. True that company might have conveyed, by appropriate deed, all its real estate, dam, and water rights, but this it avoided with scrupulous care. It conveyed not all its property but only certain designated portions. It granted "the saw mill" and "yard," but not the dam, nor the head gates, nor the land on which they rest. They remained the property of the grantor, and there is an express provision that the grantee shall bear one-half the expense of maintaining them, the grantor of course to bear the other half, a strange provision indeed if title to the whole had passed to the grantee. Further, the deed granted, not all the grantor's water power and rights, but "the following water power and privilege *and none other,* to wit: the right to draw from Wilson Lake water sufficient to furnish forty horse power with latest improved wheels" etc. This is the limit of its grant, forty horse power, under conditions existing at the time of the conveyance and continues until the water has reached a point four and a half feet below the top of the dam. When it reaches that point, Bass & Company are limited to one hundred square inches, but their grant is at all times subject of course to the prior grant to Fernald, so that if, at that low level, there is a total of two hundred square inches, Fernald and Bass & Company are each entitled to one hundred; if there is more than that quantity, still they are limited to the one hundred each, while if there is less, Fernald has a priority of one hundred and Bass & Company the balance. This is in exact accord with the provisions in the Fernald deed from Goodspeed. Bass & Company have taken the place of Goodspeed. The restriction as to the use of one hundred square inches which Goodspeed imposed upon the power remaining in his hands has passed and remains attached to the same power in the hands of Bass & Company. But it is further provided that if at any time when the water is below the four and a half feet level, Bass & Company are not using the full one hundred square inches, then the Woolen Company may draw and use through its own private waste gate the surplus up to that amount, so that their joint use will only aggregate the one hundred square inches. It should be observed in this connection however that the quantity to be used by both the Woolen Company and Bass & Company, when the latter are not using all to which they are entitled, cannot infringe upon or diminish the prior one hundred inches belonging to Fernald.

Bass & Company contend that this reservation of a portion of the one hundred square inches is all that was retained by the Wilton Woolen Co. from its entire water power ownership when the conveyance to Bass was made.   We can hardly conceive on what ground or for what purpose the grantor should have excepted the possible use of this insignificant quantity and have disposed of all the rest. It could be of no practical value of itself, uncertain as it is in both quantity and availability.   But taken in connection with the retention of all the power over and above what was conveyed to Bass, the possible value of this increment can be seen.

The great contention between the parties, however, arises during the period before the four and a half foot limit is reached.   That is the burden of the cross bill brought by Bass & Company in which they claim that the Woolen Company is not entitled to any water before that limit, that they are entitled to it all, except the Fernald grant, and they ask for an injunction to restrain its use by the Woolen Company.   This claim assumes that the Woolen Company retained no water rights after the Bass deed was given, and that assumption we have already shown to be groundless.   The maximum ownership of Bass & Company until the four and a half foot level is reached is 40 horse power, and all the power in excess of that (excepting of course the Fernald one hundred square inches) belongs still to the Woolen Company, and can be used by it in connection with its plant still further down the stream.   No other reasonable construction can be given to the deed, viewed in the light of all the facts and circumstances.

This then defines the mutual rights of Bass & Company and the Woolen Company at the various stages of water on the dam.   The testimony of the hydraulic engineer fixes the capacity of the Bass & Company's present water wheel at 40 horse power when the water is $4\frac{1}{2}$ feet below the top of the dam, and 65.35 horse power when one foot flash-boards are on the dam making a 19 foot head.   They are entitled to the former, but not to the latter.   The matter of regulating the use to comply with the right is one of hydraulic engineering rather than of law, and can doubtless be arranged by agreement.

In the first bill in equity we are asked to fix the number of hours that the water, to which Bass & Company are entitled, shall be used. No limitation as to time being stated in the deed the rule has been adopted in this State that the grantees have the right to use the

water as many hours a day as they deem proper. *Carleton Mills Co.* v. *Silver*, 82 Maine, 215; *Oakland Woolen Co.* v. *Gas Co.*, 101 Maine, 198, supra. Any other rule would seem to be an assumption of arbitrary power on the part of the Court.

We are also asked to designate the place where the 100 square inches of water to be used by Bass & Company, when the water in the dam is below the four and a half foot point, shall be measured. We think this should be measured at the water wheel. That is the point of measurement where the forty horse power is to be calculated, and we think the same point should be taken when the reduced quantity is used.

It is unnecessary to consider the case further. We have determined the construction to be placed upon the grants under which the several parties hold, and have defined their rights thereunder. The bill brought by the Wilton Woolen Company and Fernald is sustained with costs. Doubtless a final decree in that case can be agreed upon by the parties. If not, the sitting Justice can order a decree after such further hearing as he may deem necessary, and can issue a permanent injunction restraining Bass & Company from using any water in excess of the quantity to which they are entitled. The cross bill brought by the Wilton Woolen Company against Bass & Company is dismissed.

*Case remanded for further proceedings*
*in accordance with this opinion.*